<hr />

## Fred Waxmuth et al. v. Marion McDonald.

1. MARRIED WOMEN—*Entitled to Support, Without Cruelty.*—A wife is entitled to support, without violence and without cruel treatment at the hands of her husband, and if by blows and kicks inflicted upon her, he drives her from his home, she is entitled to be supported by him at such reasonable place as she takes refuge in.

2. SAME—*When Justified in Living Separate from Her Husband.*—Where a husband by reason of his use of intoxicating liquors and cruel treatment compels his wife to take refuge at a place away from his home, and afterward goes to her place of refuge, asking her to return, but accompanying his request with the assertion that he " would drink till the day of his death and she could go to hell," after her experience of his violence, the wife was not obliged, in the presence of such language, to return.

3. SAME—*Right of Action Under the Dram-shop Act.*—Where, under such circumstances, the husband flees to parts unknown, leaving the wife destitute, where his intoxication is caused by keepers of dram-shops, she is entitled to have her action against them under the dram-shop act.

Action Under the Dram-shop Act.—Appeal from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding. Heard in this court at the April term, 1901. Affirmed. Opinion filed July 12, 1901.

JAMES R. FLANDERS and COLL McNAUGHTON, attorneys for appellants.

E. MEERS and F. M. FAHEY, attorneys for appellee.

MR. JUSTICE WATERMAN delivered the opinion of the court.

This suit was brought by Marion McDonald, appellee, against the appellants, under section 9, chapter 43, Revised Statutes of Illinois, entitled " Dram-Shops."

The first count in the declaration charges the defendants with selling or giving intoxicating liquors to John McDonald, husband of the appellee, whereby the said John McDonald became habitually intoxicated, by reason of which intoxication the appellee was injured in her means of support and thereby damaged.

The second count alleges the same cause of action, injury in her means of support and the laying out and expenditure of fifty dollars in nursing and caring for her husband, John McDonald, and for services of a physician.

The third count of the declaration is for the same cause of action, alleging loss of means of support by reason of the defendants giving or selling John McDonald intoxicating liquor, and further alleging that by reason of the defendants selling and giving her husband intoxicating liquors, he beat, bruised and ill-treated her so that she was rendered incapable of performing her ordinary labor or earning a support for herself and her minor children. The defendants filed a plea of the general issue and also of the statute of limitations. There was a verdict and judgment against all the defendants for $500.

Appellee and her husband, John McDonald, lived continuously in the village of Monee, Will county, Illinois, from the year 1881 to July, 1898, except about three weeks in 1897, when Mrs. McDonald lived with her daughter, Mrs. Fahey, in Manhattan, a neighboring town. In July, 1898, Mrs. McDonald took her minor children and went again to her daughter's home in Manhattan. Mr. McDonald remained alone at their home in Monee from July, 1898, until late in the fall, when he sold their household effects and left the State, since which time he has not been heard from.

While Mrs. McDonald was at her son-in-law's (Mr. Fahey's)

home in Manhattan, in 1898, Mr. McDonald went to see her and endeavored to have her return. She then stated to him that "liquor would not rule any longer in their home;" to which he replied "I will drink to the day I die and you can go to hell."

Mr. McDonald was generally a hard working and industrious man, by occupation a ditcher, engaged in the construction of tile drains, and earned enough to provide a good living for himself and family.

From the time of the marriage of Mr. McDonald down to his leaving Monee, his credit and the credit of any member of his family in his name, was good in Monee, where he lived. His family were well and comfortably clothed and none of them was refused credit.

There was uncontradicted evidence showing that appellee's husband had, when intoxicated, severely beaten and kicked her; that his treatment of her when intoxicated was repeatedly cruel, and that as a result of his intemperate habits and intoxication the peace and happiness of the home he provided was destroyed, and she, as a result of his violence toward her, driven therefrom.

Appellee testified:

"We barely got enough groceries or clothing after July, 1894, and this down until I left in 1898. We lived in the village of Monee during three years from 1894 until the time this suit was begun. During this three years he was working among the farms around. After the summer of 1894 he didn't care whether he worked real steady. Before the three years of 1895, 1896 and 1897, if he had a job he looked after it. After that time if he had a man I have known him for three weeks at a time that he didn't go near his work. He laid in town. By that I mean he was drinking. He would go down town some mornings at three o'clock in the morning. Maybe come home at noon and he couldn't talk, and he would lay down and have a sleep sometimes and go back, and I have known him to come home like that three times in a day; go back in the evening and I wouldn't see him again until midnight. I have known him to do that repeatedly when he got on these real drinking spells. During these periods he would be around the saloons. Before he commenced to drink liquor he used to

bring his money home for the good of his family. There was a difference in his earnings after he commenced to drink. After 1895 he wasn't so particular whether he got steady work or not; he got work and wouldn't do it; but when he did work he worked just as well as before 1895. Sometimes he would work until he would finish a job, and then he would stop and wouldn't go to work again for quite a while, that is, after he commenced to drink in these places. Sometimes he would stay sober for about three months. When he did a job and they paid him—he was generally paid in town—he would never come home until he was intoxicated—after he got the money. At such times he would be intoxicated never less than a week, and I have known it to go on three months without his, you could say, drawing a sober breath. During these periods he was very cruel. He has kicked me and choked me and he drove me out of the house in winter, when I would be out six nights and couldn't get in, and I have walked eleven miles without anything to eat for days, ashamed to go in to my neighbors, when I would go out at night without a shoe on my feet. This treatment affected my health. With one of his kicks he kicked me right in the side that I feel the effects of it to-day; that I am not able to carry a pail of water with my left hand. That was about the first of November, 1897. He came home and had then been drinking for about two weeks; he came in at the door and didn't speak. I had the table set with his supper. He lifted a plate and threw it at my head. I went through a small kitchen when he threw the plate, and he took after me, and I was out all night. I was pregnant at the time and expected to be confined, and was sick from that on until the time of confinement in the month of April. After Mr. McDonald kicked me I left, and walked eleven miles to my daughter's and I remained there three weeks. When he was intoxicated he was sometimes very abusive, and at times he wouldn't say anything. If something turned up in town that didn't suit him, if he had a few words in the saloon I had to suffer when he got home. I had to have everything ready and warm for him when he came in. He would throw things at me, no matter what he got his hands on, and I would always have to leave the house when he would be in. If he was sober he treated the family all right. I saw him go into Mr. Waxmuth's that Sunday that he kicked me. After drinking the whisky that Sunday morning after I was kicked he was more like a raving maniac than anything I could tell; he was drunk. I have seen him in all the saloons. He would neglect to

come home for his dinner. By all the saloons I mean Mr. Charles Rudder, Mr. Fred Wilke, Mr. August Priese, Mr. August Plagge, Mr. Schubbe's and Mr. Fred Waxmuth. I have seen him repeatedly in these saloons and when he would come out he was intoxicated. I can't tell you how often I saw him in the saloons of these defendants; time and time again. I have seen him repeatedly back and forth. There wasn't a time hardly at all that he didn't come home, that I went myself or sent my children, Flora and Johnnie, to see where he was. I have followed my husband when he left home, and went to the saloons of these defendants. I have been driven out repeatedly during these years of 1895, 1896 and 1897, and in the fall and winter of 1894. During the years 1895, 1896, 1897 and 1898 my husband earned an average of about $400. Before he commenced to drink to excess he and I saved part of his earnings. After he commenced to drink to excess we didn't save anything. He threatened to shoot me, and I had to leave the house and go to my neighbor's, Mrs. Klein. At another time I went to a neighbor's, Mr. Sonneborn's. When I first married him I had no way to complain; if he did take a glass I didn't say anything. There is very few but what does; but as far as abusing and trying to break up my home I had no reason to complain. Up to 1894 he was a pretty straight man and treated me well. After 1894 he started drinking heavy and abusing me. The more he got to drinking the worse he got."

The marshal of the village testified that he had seen McDonald in every saloon of the place. That he would go into a saloon and take a drink like anybody else.

There was testimony to the husband of appellee having been seen during the years '95 and '98 drinking in the saloon of Mr. Waxmuth, Mr. Rudder's, Mr. Plagge's, Mr. Schubbe's, Mr. Priese's, and that he went about drinking at every saloon; that appellee's husband was quarrelsome when under the influence of liquor, got into fights and was arrested on account of intoxication.

His children testified to the treatment of appellee by him, as described by her.

There was no evidence tending to show that during the time she lived with her husband she ever wanted for any of the necessaries of life or was refused credit in any of the stores of the village in which she lived.

Waxmuth v. McDonald.

The testimony as to his drinking habits, intoxication, idleness and lessened earnings in consequence thereof was uncontradicted.

The jury were fully warranted by the evidence in finding that appellee had been injured in person and in her means of support by intoxication, caused, wholly or in part, by intoxicating liquors sold by each of the defendants. Appellee was entitled to such support as the condition in life and the pecuniary circumstances of her husband warranted. He had a right to determine what his style of living and expenditure above the necessities of life should be. It is uncontradicted that, when sober, he gave to appellee such support as was satisfactory. Like a prudent and faithful wife she not only discharged her domestic duties in the care of the house and children but earned something for the support of the family by washing and other service done for neighbors. Appellee was not only entitled to the support we have mentioned, but she was entitled to such support without violence and without cruel treatment at the hands of her husband. If by blows and kicks inflicted upon her he drove her from his home she was entitled to be supported by him in such reasonable place as she took refuge in. To her place of refuge he went, asking that she return, but accompanied the request by the assertion that he "would drink till the day of his death and she could go to hell." After her experience of his violence, she was not obliged, in the presence of such language, to return, and when he, under such circumstances, fled to parts unknown, leaving her destitute, she, because of his intoxication, caused in whole or in part by the sale of intoxicating liquors to him by the defendants, was deprived of the means of support from him, to which she was lawfully entitled.

The verdict for $500 was fully warranted by the evidence and the judgment of the Circuit Court is affirmed.

MR. JUSTICE DIBELL, having presided at the trial in the court below, took no part in the hearing of the case in the Appellate Court.